## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

**Megan Glasbrenner and Douglas**
**Neal, on behalf themselves and**
**all others similarly situated,**

**CASE NO.: 8:25-cv-00543**

**Plaintiffs,**

**v.**

**THR Property Management L.P. d/b/a Invitation**
**Homes and Invitation Homes, Inc.,**

**Defendants.**
_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff, Megan Glasbrenner ("Glasbrenner") and Plaintiff Douglas Neal ("Neal") (hereinafter "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through her undersigned counsel, brings this class action against Defendant THR Property Management L.P. d/b/a Invitation Homes ("THR Management") and Invitation Homes, Inc. ("Invitation Homes") ("Defendant") and alleges:

**I.**         **INTRODUCTION**

1.         Defendants systematically (a) fail to provide Florida tenants the statutorily required *certified mail* notice and its required disclosures ("Security Deposit

1

Notice Letter"), (b) prematurely deducts and takes possession of tenants' security deposits, in violation of the Florida Residential Landlord Tenant Act ("FRLTA"), Fla. Stat. §83.49(3)(a) and the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.79(9), (c) for those it has notified will receive its deposit back in full, Defendant fails to do so within 15 days after moving out, and (d) violations of the consumer protection act laws in the 13 states where Defendants operate and have principle offices- California, Georgia, North Carolina, Maryland, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington, and one

## II.            JURISDICTION AND VENUE

2.        This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because there are at least 100 Class members in the proposed Class, the combined claims of proposed Class members exceed $5,000,000, exclusive of interest and costs, and at least one Class member is a citizen of a state other than Defendants' state of citizenship.

3.        Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because most of the events or omissions giving rise to Plaintiffs' claims occurred in this District and Defendants are subject to personal jurisdiction in this District.

## III.            PARTIES

4.        Plaintiff Glasbrenner is a natural person who resides in Florida and was a Florida citizen at all material times herein.

5.        Plaintiff Neal is a natural person who resides in Florida and was a Florida

citizen at all material times herein.

6.      At all material times, Plaintiffs were a "tenant" pursuant to Fla. Stat. § 83.43(4). "Tenant" means any person entitled to occupy a dwelling unit under a rental agreement, pursuant to the FRLTA.

7.      Plaintiffs are a "debtor" or "consumer" as that term is defined by Fla. Stat. §559.55(8).  Plaintiffs have standing to bring a claim under the FCCPA because they were directly affected by violations of these Acts and had money taken from them in the form of a security deposit in connection with Defendant's illegal and improper debt collection activities.

8.      Plaintiffs members of the Florida Fee Class are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by Fla. Stat. §§501.203(7) and (8), respectively.

9.      Defendant THR Management is a Delaware limited partnership with a principal place of business in Dallas, TX.

10.      Defendant Invitation Homes, Inc. is a Maryland corporation with a principal place of business in Baltimore, MD.

11.      Defendant THR Management, at all material times, was and is a "landlord" pursuant to Fla. Stat. §83.43 because it is an agent of the owner and it is a lessor on the lease.

12.      Defendant Invitation Homes at all material times, was and is a "landlord" pursuant to Fla. Stat. §83.43 because it is the owner of the property and it is

3

a lessor on the lease.

13.    Defendant THR Management is a "person" subject to Fla. Stat.§ 559.72(9). *See* Fla. Stat.§ 559.55(5) and (7).

## IV.    FACTUAL ALLEGATIONS

### A.    Background on Defendants

14.    Defendant THR Management is the property management arm of Defendant Invitation Homes, a publicly corporation with a market cap of over $16 billion, that is also the United States largest single family home landlord in the country.

15.    According to Defendant Invitation Homes's 2024 Q3 Form 10-Q filing, Defendant Invitation Homes is a real estate investment trust that conducts its operations through Invitation Homes Operating Partnership LP ("INVH LP"). Defendants are a wholly owned subsidiary of INVH LP, and its wholly owned subsidiaries. Defendant THR Management provides all management and other administrative services with respect to the properties owned by Defendant Invitation Homes.  Defendant THR Management also provides professional property and asset management services to portfolio owners of single-family homes for lease, including Defendant Invitation Homes's investments in unconsolidated joint ventures.

16.    According to Defendant Invitation Homes's 2024 Q3 Form 10-Q filing, as of September 30, 2024, it owned 26,513 homes in Florida, with a 95.3% occupancy

4

rate, and $2,502 average rent.

17.    Across 12 states, Defendants own and manage over 80,000 single family homes.

18.    Although all the Florida homes are held in the name of a separate subsidiary name of Defendant Invitation Homes, Defendant THR Management is the property management agent for all of Defendant Invitation Homes's and its subsidiaries own in Florida (the "Florida Properties").

19.    The same is true for the homes in the other states Defendants operates.

20.    Defendant THR Management's property management services for the Florida Properties include, but are not limited to, leasing new tenants, maintenance, security deposit administration. Relevant here, as the property manager on behalf of Defendant Invitation Homes's subsidiaries who own the Florida Properties, Defendant THR Management collects and is responsible for the administration, post move out inspections, imposition of claims against security deposits, return of security deposits, and collection of amounts owed in excess of the deducted security deposit with tenants at the Florida Properties.

21.    The same processes and systems are in place in the other states where Defendants operate.

22.    All the Florida Properties require tenants to pay a security deposit that is

subject to the FRLTA.

**B.    Defendants Deceptive Advertising and Unfair Practices Uncovered in the FTC's Investigation and Continue to this Day**

23.    The following are facts learned by the FTC after its investigation into Defendants, and Plaintiffs incorporate the FTC's findings into their allegations.

24.    Defendants hide junk fees in its rental listings, making the actual price of consumers' monthly lease payments higher than the price Defendants advertise. It lures consumers to its rental listings by deceptively advertising lower monthly rents than they must actually pay once they sign the lease and live in the home. Baited with these attractive and lower than market rental prices, consumers pay nonrefundable application fees for the listing price and to reserve the property, only to later learn that the actual rental price is higher than advertised.

25.    Defendants accomplish this drip pricing scheme by charging people for mandatory junk fees that are not included in the advertised rental price and are not adequately disclosed before a consumer submits a rental application. For example, since at least 2018, Defendants have added undisclosed fees to the residents' rent, first in the form of a "utility management fee," and later a "Lease Easy bundle" fee, which includes the utility management fee, and "air filter delivery" fee, and a "smart home technology" (or "smart home" fee. This fee bundle which can add $60 or more to residents' rental

6

payment and over $700 over the course of a one-year lease, is mandatory for the substantial majority of Defendants' homes, yet the costs of these services are hidden from people. As recently as 2023, Defendants added yet another mandatory fee that is excluded from the advertised rental price: an $85 monthly "internet package" fee.

26.     According to the 2024 FTC complaint filed against Defendants, Defendants' hidden fee bundle is big business. From 2021 through June 2023, Defendants charged consumers over $60 million Lease Easy fees as part of their monthly rental payments. In 2019, Defendants' CEO called on Invitation Home's Senior Vice President responsible for overseeing the company's fee program to "juice this hog" by making the smart home fee mandatory to renters. In 2021, that same Senior Vice President described a proposed price increase of the mandatory smart home fee as "a tactical issue that has garnered the interest of one of the corner offices on the 20th floor" and pledged to the CEO that "between you and I, I have not let this go. I will get it taken care of."

27.     Moreover, Defendants were aware that these profitable fees were excluded from rental listing prices and worked to hide the fees from consumers. For example, when a Vice President asked why consumers could not see the Lease Easy fees added to the monthly rent amount before they applied, Invitation Homes Senior Vice President of Operations confirmed that it was the company's practice not to display or itemize the fees on the application portal, commenting, "we can't show all

7

additional fees, so we don't want to show any." In another example, a November 2021 Invitation Homes slide deck instructed employees to "only disclose [the Lease Easy bundle] fee on website pages and other marketing collateral when critical." The same slide deck described the company's revision to a landing page in the Invitation Homes application portal to "update to be more generic and remove the pricing from header."

28.     Defendants have received numerous consumer complaints about add-on fees not being included in the advertised rental price. As one consumer complained, "if an air filter is required then why isn't it include[d] in your base rent. It seems very confusing for it to be added after an agreement of $1850."

29.     Defendants' fee program has resulted in large profits. For example, a September 2020 Invitation Homes slide deck to it Board of Directors estimated the "annual impact" of a mandatory smart home fee to renters to be $24-26 million,[1] and the air filter delivery and utility management fees to be $4.3-9.5 million and $1.9 million, respectively.

30.     The impact to consumers and the home rental marketplace is significant, even beyond the more than $60 million in hidden fees. Consumers expend money and time to apply to Defendants' listings, reserve homes, and relocate their families, only

_____

[1] This estimate was based on a Smart Home fee of $19.95 - $29.95. Invitation Homes has since increased the Smart Home fee to $30 for homes without a video doorbell and $40 for homes with a video doorbell.

to learn their monthly payment is higher than advertised.

**(i)    Defendant's Deceptive Home Listings and Application Process**

31.    While Invitation Homes' home listings have changed several times since 2021, all versions have failed to include all mandatory fees in the advertised monthly lease price and have failed to inform people what the total monthly rent is inclusive of fees.

32.    Potential    residents    who    visit    Defendants'    website, www.invitationhomes.com, can search for a home by entering various specifications, including monthly rental price. The search populates rental listings that display the advertised monthly rent. A typical search results page looks like this:



33.     When consumers click on a home, they go to a listing page with photographs of the property and additional information, including the "Lease for" price of the home prominently displayed at the top of the listing. Prior to the FTC's settlement with Defendants in late 2024, a typical home listing looked as shown below:



34.     When consumers click on the "Apply Now" button at the top of the listing, they are redirected to "Rent Café," Defendants' rental application portal, where

consumers can enter a move-in-date, select a lease duration, and click to begin their rental application.

## Basic Lease Information

Home is available for move-in starting on 4/10/2021

Move-In Date        4/7/2021

Lease Term:         12 months

Rent:               $1,690.00

**START APPLICATION**

35.    Prior to 2021, and continuing through the present day, Defendants have failed to provide the true monthly price that consumers must pay to rent one of its properties. This is consistent across the listing price displayed in Defendants' property search results, the advertised "Lease for" price on the individual listings pages, and the "Rent" price displayed in the application portal (each depicted above). Because Defendants charges mandatory monthly fees on top of the advertised rent, consumers typically paid $40-45 more per month in 2021, and now much pay $60 to $145 more per month than the advertised monthly lease price.

36.    Thousands of consumers have submitted home rental applications to Defendants and paid nonrefundable fees—including application fees up to $55 and holding fees up to $500 to exclusively reserve a home (which becomes nonrefundable if the consumer does not sign a lease)—to rent at a deceptively lower rental price.

Defendants' holding agreements have reiterated expressly that the monthly rental amount is the "Lease For" price advertised on the listing, with no reference to mandatory add-on fees.

37.    People do not learn the total monthly cost to rent a home from Defendants until they receive a copy of their lease, which is the first time that Defendants itemizes the mandatory add-on fees and discloses the total out-of-pocket rental cost for the house the consumer is leasing.

38.    By this time, all applicants have paid nonrefundable application fees, and many have paid holding fees and other expenditures related to moving—only to learn that their rent could be as much as $1,740 higher per year.[2]

39.    In many instances, even Defendants' lease packages have misled people about add-on fees and what people can expect to pay monthly for the duration of their lease. For example, from at least 2019 to 2022, Defendants used a lease with a cover page that misrepresented the recurring monthly fees that people must pay as part of their rent, only disclosing additional fees in an addendum buried toward the end of a 60-page lease. For instance, the cover page of the lease said the monthly air filter delivery charge would be $0.00, but a buried addendum told consumers the company charge renters a $9.95 monthly air filter delivery fee after it confirmed the number and

_____

[2] Defendants offer, and many consumers sign, two-year leases, thus obligating these consumers to $3,480 in rent than consumers expect to pay.

size of the air filters in the home. In many cases, this was not done until after the lease began, meaning the fee would not be added until after people had already moved in and paid one or more months of rent. One Invitation Homes employee told their manager that this practice was "[a]t best… a contradictory lease in this format. At worst, we have something that has the appearance of intentional dishonesty."

40. Defendants also advertise its home listings through third-party websites such as Zillow and Realtor.com where the monthly rental payment is prominently displayed in search engine results and the listing itself. Just as with the Defendants' website listings, the advertised rental price does not include mandatory fees, and consumers do not learn the total monthly cost to lese these homes until they receive a copy of their lease—that is, until after paying application fees, and in many instances, holding fees and moving-related expenses.

41. By excluding mandatory fees from the advertised monthly price, people also are not able to accurately compare Defendants' home prices with the prices of other companies' homes.

**(ii) Defendants' Buried Fee Language Confuses and Further Misleads Consumers**

42. To the extent Defendants includes information about its mandatory add-on fees, this information is inadequate in terms of its content, presentation, proximity,

prominence, or placement such that people are unlikely to see or understand the information and are also unlikely to understand that the advertised lease amount does not include add-on fees.

43.    For example, Defendants buries conditional and confusing language in its typical listing, variations of which the company has been using since at least 2021. Defendants do not present this language in an easily noticeable or easily understandable manner. As depicted below, in December 2021, for example, the listing said, "Lease Easy with three great Invitation Homes services that *come standard in your lease* for up to $45[3] a month: Smart Home, Air Filter Delivery and Utility Management." (emphasis added).



Even if consumers see or read this text—buried in the fourth paragraph of the listing

---

[3] In January 2021, the Lease Easy bundle fees were $40, before increasing in mid-2021 to $45. In early 2022, Invitation Homes raised the Lease Easy bundle fees to $55, and raised them again in mid-2022 to $60.

in less prominent than the advertised rental price—the language does not clearly explain that the $45 fee is not included in the advertised lease price or offered as an optional add-on, but is in fact a mandatory monthly fee *on top* of the advertised lease price (the "Lease for" price) that is prominently displayed at the top of the listing.

44.    Defendants bury additional information about its fees in gray microtext at the very bottom of the listing, written in confusing and conditional language and found only if someone scrolls past a map of the home's location and photos of other unrelated listings. In 2021, the text look as shown below:

Lease your Invitation Home through InvitationHomes.com or with the help of a licensed leasing agent. All leasing information is believed to be accurate, but changes may have occurred since photographs were taken and square footage is estimated. Furthermore, prices and dates may change without notice. Invitation Homes does not lease homes through Craigslist or other classified advertising services. Please note this home may be governed by a HOA and could require additional applications and/or fees. An account set-up fee will be charged on all new leases. To better serve our residents, Invitation Homes is pet-friendly with some breed restrictions and allows up to three pets with a monthly fee. Lease Easy standard services are required in your lease and will be billed monthly as separate items on your account ledger with your rent - up to $45 monthly for all three services: Smart Home in homes with Smart Home features. Air Filter Delivery in homes with an HVAC system. Utilities Management, where available, plus your monthly utility usage. If your home has a pool, there is a $120 monthly pool fee. Broker participation welcome, so please refer to MLS. Please contact your leasing agent for more information.

45.    Only in the middle of the fifth line of microtext at the very bottom of the page does any purported disclosure language appear: "Lease Easy standard services are required in your lease and will be billed monthly as separate items on your account ledger with your rent—up to $45 monthly for all three services: Smart Homes in homes with Smart Home features. Air Filter Delivery in homes with an HVAC system. Utilities Management, where available, plus your monthly utility usage." Even if consumers were to see this tiny, buried language, the text does not make clear which Lease Easy fees are required for that specific home, nor that the Lease Easy "standard services" are not included in the advertised "Lease For" price.

46.     Similarly conditional and confusing language regarding the Lease Easy fees appeared in the 2021 version of the Rent Café application portal, buried in the midst of multiple other application terms and in small blue text set against blue background, as depicted below:



47.     As with the prior references to Lease Easy, even if consumers were to see this language, the text does not make clear which Lease Easy fees are required for

that specific home. Further compounding the confusion, on the same page below the Lease Easy text, in the "Basic Lease Information" field, clear text displayed the "Rent" amount and *excludes the Lease Easy fees*.

48.     After learning of the FTC's investigation into these practices as alleged in this complaint, Defendants put more information about fees on its website, but all versions of Defendants' website listings still advertised a monthly leasing price that fails to include any mandatory fees. And rather than clearly disclosing the amount of the mandatory fees on each listing, Defendants buried general fee information behind hyperlinks it knows consumers will not see. Defendants Senior Vice President of Operations conceded that Defendants was aware that "[m]ost people don't look at the link."

49.     Defendants' listings on third-party websites like Zillow and Realtor.com similarly fail to adequately disclose to consumers that their ongoing monthly rent obligation includes mandatory add-on fees that are not included in the advertised lease price. Moreover, while Realtor.com features a dropdown box designed to display fees and costs of a home, there is no such information included about the fees and costs for the Invitation Homes properties.

**(iii) Defendants Have Received Numerous Complaints About its Deceptive Rental Advertisements**

50.    For years, Defendants have been aware of consumer complaints about its deceptive fee practices. Since at least 2018, Defendants have tracked consumer complaints and "escalations," which the company defines as any instance in which a resident contacts corporate officers about an issue, posts a negative review or complaint online, or submits a complaint to the Better Business Bureau. Monthly reports of escalations, entitled "Resident Voice Reports," are widely distributed throughout the company, including to senior management and executives. These monthly reports summarize resident surveys, reviews, and complaint metrics, including a breakdown of the percentage of consumer escalations by issue and the substance of some complaints.

51.    People have complained extensively about hidden fees that Defendants tacks onto their rent, including the Lease Easy Fees. For example:

(a)    "Invitation Homes advertises a price to rent a home and in their advertisement the[y] mention an option of adding SMART home and Filter maintenance. However these are not options they are requirements and as such should be added to the rental price and not listed on the website as options."

(b)    They advertised the home as for rent for $1586. They then add on water bill, monthly pool fee, smart home fee, dog fee and all those other fees so the rent goes up to $1800."

(c)  I'm moved in paying for smart home, oh yes, besides the rent, IH tacks on additional fees for that and just about everything else, so beware prior to signing a contract."

52.    Notably, just one month after Defendants made the Lease Easy mandatory, Invitation Homes's February 2021 Resident Voice Report documented a significant jump in consumer complaints about additional fees, and the company noted in its April 2021 Resident Voice Report that escalations about additional fees were "trending up."

(iv) Defendants Rejected a Proposal to Disclose the Total Monthly Rent to Consumers

53.    Defendants have continued to hide the true total rental price of its homes, even while recognizing that the company uses hidden fees in marketing its rental homes.

54.    In a June 2021 email, Invitation Homes' Senor Vice President of Operations emailed other senior executives about whether the company should begin "just listing homes at the full asking price, inclusive of all the mandatory programs, with a breakdown of what is included….We agree that it is the best approave given the current market conditions and the desire to be more transparent in communicating true cost to prospective residents with the various market nuances when it comes to what and how we charge."

19

55.     Consistent with this proposal, in July and August 2021, Defendants marketing department circulated a slide deck and listing mockup that would include all mandatory fees in the advertised price, saved with a file name of "Bundled Price Transparency and Rent Calculator." The company's Senior Vice President of Marketing and Customer Experience explained that the proposed listing change was "about no hidden fees or similar idea, with rent calculator as a tool." She further explained that consumers are "trying to understand anything related to the mandatory services above as well as basic option services."

56.     Despite this recognition that Defendants were using "hidden fees" and that consumers expect rent prices to be transparent and include all mandatory fees, Defendants continue to deceptively exclude mandatory monthly fees from the advertised rental price.

57.     Consumer complaints have persisted. For example, in May 2022, a Vice President of Operations commented on an "uptick in BBB [complaints] regarding fees," stating, "Please speak with your team to verify they are going over all fees. We need this disclosed during leasing process, not once the lease is generated. People seem to not know about filter fee charge/but filter is delivered once per quarter." Through late 2023, "additional fees" has remained one of the top five most escalated issues.

## C.          Defendant's Security Deposit Practices in Florida

58.     Defendants' security deposit practices also came under FTC scrutiny in

the 2024 Complaint following its investigation.

59.     Most notably, the FTC alleged:

(a)   "Invitation Homes' security deposit dispute process likewise makes it extraordinarily difficult for people to receive security deposit refunds to which they are entitled.

(b)   When an Invitation Homes associate has followed up on an escalation, in many instances the associate has admitted that the charges were in fact assessed for improper reasons. **Simply put, the company waits to see if the resident will challenge the charges before reversing them.**

(c)   In another example of how the company's security deposit process is stacked against residents, a property manager emailed their boss, a Vice President of Operations in charge of a region covering thousands of homes, to inform them: "I have instructed my team that if it is 100% removable to credit/reverse it, but if it is questionable to leave it and we can negotiate the charge if challenged." (emphasis added). Thus, residents bore the burden of spotting and challenging improper deductions in the hopes their dispute would be both: 1) heard (despite no such guarantee given the company's documented poor customer service), and 2) successful.

60.     On September 27, 2024, Defendant Invitation Homes entered into a Stipulated Order for permanent injunction, monetary judgment, and other relief.,

including a $48 million dollar fine.

61.     As part of the September 27, 2024 stipulation, Defendant Invitation Homes agreed to implement security deposit withholding standards and training, keep records of inspections, and keep documentation of conditions relating to security deposit withholding or charges to consumers.

62.     Because Defendant THR Management managed Defendant Invitation Homes, Inc.'s Florida Properties in such a manner that it put the burden on tenants to challenge improper charges, it was never more imperative that Defendant followed the FRLTA's notice of intention to impose a claim on security deposit procedures. However, that is not the case.

63.     After a tenant moves out, Fla. Stat. §83.49(3)(a) requires Defendant, as the property manager acting as an agent of the landlord of the Florida Properties, to either return the security deposit in full to a tenant within 15 days of moveout, or it can send a *certified mail* notice of the landlord's intent to impose a claim against a tenant's security deposit within 30 days of lease termination, that notice must also include all the statutory language required by Fla. Stat. §83.49(3)(a).

64.     However, when Defendants seek to notify tenants of the Florida Properties that the landlord seeks to impose a claim upon a tenant's security deposit, Defendants fail to send a Security Deposit Notice Letter that complies with Fla. Sta. §83.49(3)(a) in two main ways: (1) Defendants do not send a *certified mail* Security Deposit Notice Letter, but instead emails and/or allegedly sends a regular U.S. mail

a "NOTICE OF INTENTION TO IMPOSE CLAIM ON SECURITY DEPOSIT" letter to tenants (the "Notice Letter"), and (2) the Notice Letter includes a Statement of Deposit Accounting ("SODA") that shows that the security deposit has already been deducted and applied towards the alleged amount owed prior to the end of the 15 day object period.

65.     For example, on October 31, 2024, Plaintiff Glasbrenner received an email from Defendants (via Defendants' security deposit accounting software system, Yardi) that stated:

> Thank you for choosing to lease with Invitation Homes. We have completed the final move out accounting for your home located at 12610 Early Run Ln. Attached you will find a copy of your detailed Move-Out Statement for your review. A copy was also sent to you via US Mail to Ruskin,, FL 33573. If this is not the correct forwarding address, or you have any questions regarding your Move-Out Statement, please contact your local property management office. . . .

66.     The reason the United States Postal Service created the certified mail service is to provide proof of delivery for important, time-sensitive documents, such as the FRLTA security deposit notice letter. Each certified mailing includes a tracking number that shows delivery attempts and if delivery was successful or not on the recipient.

67.     The reason that the FRLTA requires that the security deposit notice letter be sent by certified mail is to ensure that tenants actually see the charges imposed upon their deposit and the charges added in addition to the deposit, to provide the tenants an opportunity to object within the 15 day objection period,

before Defendants are authorized to keep the deposit funds.

68.    Defendants sending of the Notice Letter by non-certified mail means, such as e-mail and regular U.S. mail, creates a high likelihood that tenants will overlook the notice and never see it.

69.    Certified mail also prevents Defendants and tenants from pointing the finger at each other as to whether they received the notice or not, and instead a third party neutral, the U.S. Postal service, serves as a record keeper as to if and when the notice was provided to tenants.

70.    By failing to send the Notice Letter by certified mail, Defendants continued its trend, that the FTC pointed out, of putting the burden on tenants to challenge the charges, to the point of having to track down the Notice Letter.

71.    Additionally, the SODA attached to the Notice Letter shows an itemized list of deductions for alleged damages or amounts owed.

72.    The SODA shows that Defendants have prematurely claimed all or a portion of the tenants' security deposits and has applied it to various amounts allegedly due to Defendants without first providing the required certified mail notice letter and without waiting the required 15 day objection period before taking possession of the tenants security deposit funds. (**Exhibit A**)

73.    Put another way, Defendants can't move the money out of the dedicated non-interest bearing bank account until after sending the certified mail notice letter and waiting for the 15 day objection period to expire. After the 15 day

24

deadline, Defendants are free to move the funds into either its own, parent's, or subsidiary's bank accounts. However, Defendants' SODA shows otherwise.

74.    Upon information and belief, Defendants' routine practice is to immediately take possession and control over tenant security deposits after a tenant moves out, not to send a legally compliant Security Deposit Notice by certified mail, but to instead e-mail tenants a non- compliant Final Account Statement to all tenants at properties managed and/or owned by Defendants in Florida.

## D. The Florida Residential Landlord Tenant Act ("FRLTA") Governs Tenants' Security Deposit Procedures in Florida

75.    The FRLTA requires strict compliance regarding residential leases that require security deposits. The FRLTA contains requirements for disclosures in the lease and procedures that must be followed before a claim can be made against tenants' security deposit monies.

76.    Fla. Stat. §83.49(2) of the FRLTA governs lease disclosure requirements for landlords and property management companies and states:

(2) The landlord shall, in the lease agreement or within 30 days after receipt of advance rent or a security deposit, give written notice to the tenant which includes disclosure of the advance rent or security deposit. .. The written notice must:

(a)    Be given in person or by mail to the tenant.

(b)    State the name and address of the depository where the advance rent or security deposit is being held or state that the landlord has posted a surety bond as provided by law.

(c)    State whether the tenant is entitled to interest on the deposit.

(d)    Contain the following disclosure:

YOUR LEASE REQUIRES PAYMENT OF CERTAIN DEPOSITS. THE LANDLORD MAY TRANSFER ADVANCE RENTS TO THE LANDLORD'S ACCOUNT AS THEY ARE DUE AND WITHOUT NOTICE. WHEN YOU MOVE OUT, YOU MUST GIVE THE LANDLORD YOUR NEW ADDRESS SO THAT THE LANDLORD CAN SEND YOU NOTICES REGARDING YOUR DEPOSIT. THE LANDLORD MUST MAIL YOU NOTICE, WITHIN 30 DAYS AFTER YOU MOVE OUT, OF THE LANDLORD'S INTENT TO IMPOSE A CLAIM AGAINST THE DEPOSIT. IF YOU DO NOT REPLY TO THE LANDLORD STATING YOUR OBJECTION TO THE CLAIM WITHIN 15 DAYS AFTER RECEIPT OF THE LANDLORD'S NOTICE, THE LANDLORD WILL COLLECT THE CLAIM AND MUST MAIL YOU THE REMAINING DEPOSIT, IF ANY.

IF THE LANDLORD FAILS TO TIMELY MAIL YOU NOTICE, THE LANDLORD MUST RETURN THE DEPOSIT BUT MAY LATER FILE A LAWSUIT AGAINST YOU FOR DAMAGES. IF YOU FAIL TO TIMELY OBJECT TO A CLAIM, THE LANDLORD MAY COLLECT FROM THE DEPOSIT, BUT YOU MAY LATER FILE A LAWSUIT CLAIMING A REFUND. YOU SHOULD ATTEMPT TO INFORMALLY RESOLVE ANY DISPUTE BEFORE FILING A LAWSUIT. GENERALLY, THE PARTY IN WHOSE FAVOR A JUDGMENT IS RENDERED WILL BE AWARDED COSTS AND ATTORNEY FEES PAYABLE BY THE LOSING PARTY.

THIS DISCLOSURE IS BASIC. PLEASE REFER TO PART II OF CHAPTER 83, FLORIDA STATUTES, TO DETERMINE YOUR LEGAL RIGHTS AND OBLIGATIONS.

Fla. Stat. § 83.49(2) (the "Security Deposit Lease Language").

77.    As part of Defendant THR Residential's management duties at the

Florida Properties, it utilizes standard form templates for its lease agreements. These leases included the required FRLTA disclosure language. Thus, Defendant THR Residential was aware of its FRLTA obligations as the property manager agent of the landlord, Defendant Invitation Homes.

78.     The FRLTA also includes specific provisions for how landlords and property management companies are to make claims against a tenant's security deposit after move out. Specifically, Fla. Stat.§ 83.49(3)(a) of the FRLTA states:

> (a)    Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or his intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:
>
> This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to (landlord's address)

Fla. Stat. § 83.49(3)(a)

79.     The penalty for noncompliance with the FRLTA's certified mail notice letter requirement is that the landlord and property management company forfeit the legal right to collect any of the security deposit funds and all security deposits in the landlord or property management's possession must be returned to tenants:

> If the landlord fails to give the required notice within the 30-day period, he or he forfeits the right to impose a claim upon the Security Deposit and may not seek a setoff against the deposit but may file an action for damages **after return of the deposit.**

Fla. Stat. § 83.49(3)(a)(emphasis added).

80.     The landlord, or property management company acting on its behalf, cannot apply a tenant's security deposit monies towards an alleged outstanding balance that is disclosed in the notice letter because at the time the notice letter is sent; the landlord or property management company has no legal right to assert that the landlord is entitled to the security deposit money. The landlord must wait until after the 15 day objection period exp1res:

> (b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, **the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages.** The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

Fla. Stat.§ 83.49(3)(b)(emphasis added).

81.     For the Florida Properties it managed or owned, Defendants routinely violated Fla. Sta.§ 83.49(3)(a) of the FRLTA in three ways: (1) it fails to send a complaint notice letter by certified mail; (2) it fails to provide the tenant with 15 days to object to its claims against their security deposit before taking possession and control of the tenants' security deposits, and (3) it unlawfully sends communications to tenants seeking a setoff of amounts allegedly due from the

tenants.

82.     According its SODA, Defendants take possession and control of tenant security deposits well before the 15-day objection period has expired in violation of the FRLTA, regardless of whether they sent by certified mail or not.

83.     Defendants fail to send a notice letter to tenants that complies with Fla. Stat. § 83.49(3)(a) at all to tenants at all properties it manages in Florida.

84.     The only way Defendants could ever deduct a tenant's security deposit from alleged amounts owed is if Defendants sent a certified mail notice letter that complied with the content and timing of Fla. Stat. § 83.49(3)(a), and then waited for the 15 day tenant objection period to expire. Only after the expiration of the 15 day objection period could Defendants legally take the security deposit monies out of the non-interest security deposit bank account and transfer those funds into another bank account owned by Defendants.

85.     Additionally, the Florida legislators added Fla. Stat. § 83.49(1)(a) to the FRLTA, which prevents landlords and property management companies from prematurely transferring money from landlord/property management company's security deposit bank account to the general operating account until that the security deposit money is actual due to the landlord or property management company:

> The landlord shall not comingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys *until* such moneys are actually due the landlord.

> Fla. Stat. § 83.49(1)(a) (Emphasis added).

29

86.     Thus, Defendants' failure to send a Security Deposit Notice Letter by certified mail that complies with Fla. Stat. § 83.49(3)(a) is also a violation of Fla. Stat. § 83.49(1)(a) by comingling a tenant's security deposit money from the dedicated security deposit interest bearing account with the general operating account money before that security deposit money was actually due to Defendants by way of expiration of the Fla. Stat. § 83.49(3)(a) 15 day objection period.

87.     Plaintiffs, on behalf of themselves, and all others similarly situated, seeks a return of all tenant security deposits in full as a result of Defendants numerous FRLTA violations, and statutory and actual damages under the FCCPA for asserting a legal right to deduct tenant security deposits when that right does not yet exist for Defendants to deduct or comingle the security deposit funds into Defendants' account.

**E.    Plaintiff Glasbrenner's Facts**

(i) Undisclosed Mandatory Fees

88.     In January 2021, Plaintiff Glasbrenner saw Defendants' listing of a property on Realor.com.

89.     The advertised price for the rent was $1,895, as shown below:

30



90. The clearly advertised price includes not disclaimers of mandatory fees that would increase the rent price.

91. Based on the advertised price of $1,895, Plaintiff Glasbrenner applied for the home and paid a nonrefundable application fee.

92.     On Plaintiff Glasbrenner's application, the rent was again represented to be $1,895, as shown below.



| Application For "12610 Early Run Ln" | |
|---|---|
| 12610 Early Run Ln,<br>Riverview,FL ,<br>33578<br>Phone: (888) 990-4684 | |

**Apartment Information**

| | | | |
|---|---|---|---|
| Apartment: | 10114346 | Move in Date: | 2/13/2021 |
| Floor Plan: | 4/2 0 sqft | Lease Term : | 13 |
| Bed: | 4 | Deposit: | $1895.00 |
| Bath: | 2.00 | Rent: | $1895 |
| Area: | 1956 | | |

Additional security deposits are required for credit screening recommendations below an accepted level, not including a denial recommendation.

If you receive additional income (i.e. alimony, child support, retirement benefits, housing voucher, etc.), you may include this amount in the "additional Income" field of the application. Prior to approval, evidence of any additional income identified on your application is required.

93.     The application did not include any mention of any additional mandatory or option fees that would have increased the price of rent above $1,895.

94.     Plaintiff Glasbrenner was approved by Defendants, and signed a lease for 12610 Early Run Ln, Riverview, FL. Exhibit B ("2021 Lease").

95.     However, the first time Plaintiff Glasbrenner was made aware that her monthly rent payment would be above $1,895 was when she was presented the 2021 lease to sign, after she already paid a nonrefundable application fee.

32

96.    As seen below, the 2021 Lease discloses that Plaintiff Glasbrenner's total monthly rent would actually be $1,949.95, which is well above the advertised $1,895. Exhibit B.

97.    The $1,949.95 included a mandatory $19.95 Smart Home fee that was not disclosed in the adverting of the rent on Realtor.com, yet was mandatory for Plaintiff Glasbrenner to pay.

98.    Plaintiff Glasbrenner paid the $19.95 Smart Home fee every month from 2/25/2021 through 3/24/2022 under the 2021 Lease, paying $250.35 more than the advertised rent price.

99.    Plaintiff Glasbrenner's 2021 Lease did not contain a purported class action waiver.

100.    As part of the 2021 Lease, Plaintiff Glasbrenner paid a $1,895 security deposit to Defendants.

101.    After Plaintiff Glasbrenner's 2021 Lease was over, Plaintiff Glasbrenner was offered a lease renewal with a rent of $2,122.00.

102.    However, when Plaintiff Glasbrenner went to sign the lease renewal agreement, the total rent was actually $2,186.90. Included in the $2,186.90 was a mandatory $19.95 Smart Fee (which was in Plaintiff's 2021 Lease), but now

Defendants added a $9.95 Filter Fee (shown as "Other" on the 2022 Lease).



**RENEWAL RENTAL AGREEMENT**

This **Renewal Residential Rental Agreement** (called the "**Lease**") is entered into on 1/17/2022 ("**Effective Date**") by and between IH6 Property Florida, LP ("**Landlord**"); and

| Resident's Name: Justin Glasbrenner | Resident's Name: |
| Primary Phone #: 5717497905 | Primary Phone #: |

| Resident's Name: Megan Glasbrenner | Resident's Name: |
| Primary Phone #: 7034740840 | Primary Phone #: |

| Resident's Name: | Resident's Name: |
| Primary Phone #: | Primary Phone #: |

| Resident's Name: | Resident's Name: |
| Primary Phone #: | Primary Phone #: |

(collectively, "**Resident**" whether one or more).

Lease Term:  03/25/2022 to 03/24/2023      Amount:  $ 2122.00
             03/25/2023 to 03/24/2024               $ 2207.00
Residence Address: 12610 Early Run Ln, Riverview, FL 33578

| MONTHLY RENTAL CHARGES | | DEPOSITS (Previously Paid) | |
|---|---|---|---|
| Base Rent | 2122.00 | Refundable Security Deposit | 1,895.00 |
| Pet Rent | 35.00 | TOTAL DEPOSITS PAID | 1,895.00 |
| Pool Service | 0.00 | | |
| Landscaping Service | 0.00 | | |
| Smart Home | 19.95 | | |
| Amenity / Appliance Fee | 0.00 | | |
| Other | 9.95 | | |
| TOTAL MONTHLY RENT | 2,186.90 | | |

Exhibit C ("2022 Lease")

103.    Plaintiff Glasbrenner's $1,895 security deposit paid for the 2021 Lease transferred over to the 2022 Lease.

104.    Plaintiff Glasbrenner paid the mandatory $19.95 Smart Home fee every month from 3/25/2022 through 3/24/2024, which amounted to $478.80 more than the

34

rent that was advertised for renewal.

105.    Additionally, Plaintiff Glasbrenner paid the mandatory $9.95 Smart Home fee every month from 3/25/2022 through 3/24/2024, which amounted to $238.80.

106.    Plaintiff Glasbrenner's 2022 Lease did not contain a purported class action waiver.

107.    In or around late 2023, Plaintiff Glasbrenner received a lease renewal offer from Defendants that advertised the rent as $2,273.00.

108.    However, when Plaintiff Glasbrenner signed the 2024 Lease, her actual rent was much higher than $2,273.00, as seen below.

### Summary of Lease Charges

This Summary of Lease Charges ("Summary") is hereby incorporated by reference into and made part of the attached Renewal Rental Agreement ("Lease"). Each reference in the Lease to any term of this Summary shall have the meaning as set forth in this Summary. In the event of a conflict between the terms of this Summary and the Lease, the terms of the Lease shall prevail. Any capitalized terms used herein and not otherwise defined shall have the meaning as set forth in the Lease.

**Residence Address:** 12610 Early Run Ln, Riverview, FL 33578

| Lease Term: | | | | |
|---|---|---|---|---|
| 03/25/2024 | to | 03/24/2025 | $ 2273.00 | |
| 03/25/2025 | | 03/24/2026 | $ 2300.00 | |

| MONTHLY RENTAL CHARGES | | DEPOSITS (Previously Paid) | |
|---|---|---|---|
| Base Rent | $ 2273.00 | Refundable Security Deposit | $ 1,895.00 |
| Pet Rent | $ 40.00 | TOTAL DEPOSITS PAID | $ 1,895.00 |
| Pool Service Fee | $ 0.00 | | |
| Landscaping Service | $ 0.00 | | |
| Smart Home | $ 30.00 | | |
| Air Filter Service Fee | $ 9.95 | | |
| Internet Package Fee | $ 85.00 | | |
| TOTAL MONTHLY RENT | $ 2,437.95 | | |

35

Exhibit D ("2024 Lease).

109.    As seen, the 2024 Lease, Plaintiff Glasbrenner's total monthly rent was actually 2,437.95, which is significantly higher than the advertised $2,273.00.

110.    Included in the $2,437.95 was a mandatory $30.00 Smart Home Fee, which Plaintiff paid every month from 3/25/2024 through 10/11/2024, which amounted to $210 in rent payments that was not represented in advertised $2,273.

111.    Also included in the $2,437.95 was a mandatory $9.95 Air Filter Service Fee, which Plaintiff Glasbrenner paid every month from 3/25/2024 through 10/11/2024, which amounted to $69.65 in rent payments that was not represented in the advertised $2,273.

112.    Defendants also included a new undisclosed fee that Plaintiff Glasbrenner had not paid in the 2021 and 2022 leases, a mandatory $85 Internet Package Fee, which Plaintiff Glasbrenner paid every month from 3/25/2024 through 10/11/2024, which amounted to $595 in rent payments that was not represented in the advertised $2,273.

113.    As part of the 2024 Lease, Plaintiff Glasbrenner's previously paid $1,895.00 security deposit from the 2022 Lease transferred to the 2024 Lease.

114.    Plaintiff Glasbrenner suffered actual damages by paying each months mandatory Smart Home Fee, Air Filter and Air Filter Service Fee, and a Internet Package Fee that were not disclosed in the advertised rent.

115.    Plaintiff Glasbrenner's 2024 Lease purportedly includes a Class Action

Waiver, but Plaintiff Glasbrenner did not sign that section of the lease, which required additional signature, showing her intention to not be bound by that specific section of the lease.

116.    To the extent the Court finds Class Action Waiver in Plaintiff Glasbrenner's 2024 Lease is valid and applicable, it only applies to claims related to her 2024 Lease, not her previous leases. not his previous lease.

117.    Plaintiff Glasbrenner's 2024 Lease purportedly includes a Class Action Waiver, which is unconscionable under the FRLTA because it takes away tenants' rights under the FRLTA and tenants have no choice to accept the class action waiver after paying a non refundable application fee, there was no mention of the class action waiver in the advertised rent or on the application prior to paying the nonrefundable application fee.

118.    Plaintiff Glasbrenner's 2024 Lease purportedly includes a Class Action Waiver that is void and unenforceable under the FRLTA because it takes away tenants' ability to enforce their rights collectively under the FRLTA, which is normally one of the only ways tenants can find an attorney to bring a FRLTA claim due to the relatively small amounts at issue, which limits tenants options to enforce their FRTLA rights because of the large costs of hiring an attorney as compared to the relatively low amounts of damages. The class action vehicle enables tenants to be able to enforce their rights.

119.    Additionally, the Plaintiff Glasbrenner's 2024 Lease's Class Action

Waiver is void and unenforceable because it takes away rights afforded under the FCCPA, which specifically contemplated class actions and class actions are referenced in the statute.

120.     When Plaintiff Glasbrenner paid her deposit and when it subsequently transferred under the 2022 and 2024 leases, Defendants took the deposit and deposited it in the non-interest bearing account.

121.     Defendant THR Management is the property manager on behalf of IH6 Property Florida, LP and Invitation Homes, and also managed all the other Florida Properties.

122.     Defendant THR Management handled the tenant leasing for the Property and the Florida Properties using Defendant THR Management's own standard form leases, and collection depositing of tenant security deposits. Defendant THR Management used the same leases and security deposit collection and depositing procedures at all the properties in managed in Florida.

123.     Prior to terminating the Lease, Plaintiff Glasbrenner provided a forwarding address to Defendants on a standard form Notice of Intent to Vacate form (**Exhibit E**) that Defendants provides its tenants, so Defendants could send Plaintiff Glasbrenner a certified mail notice letter or mail her back her security deposit in full, on behalf of itself or as an agent of the landlord more than 7 days prior to when she vacated the property, which is compliant under the FRLTA 83.49(5).

38

124.    Exhibit E is a form that Defendants requires all tenants at all the Florida Properties to fill out to ensure there is a move out date and a forwarding address.

125.    Defendants failed to (a) return Plaintiff Glasbrenner's security deposit in full within 15 days of lease termination; and (b) to provide Plaintiff Glasbrenner with a certified mail notice letter within 30 days of Plaintiff Glasbrenner moving out.

126.    Instead, on October 31, 2024, Defendants emailed (via Yardi) the Notice Letter to Plaintiff Glasbrenner.  **(Exhibit A).**

127.    The email stated that Defendants had sent the Notice Letter by U.S. mail also.

128.    Plaintiff Glasbrenner did not receive a U.S. mail letter. Even if she did, it would not have been compliant with the FRLTA.

129.    Plaintiff Glasbrenner never received a certified mail notice letter within 30 days of her lease termination informing her of Defendants' intent to impose a claim against Plaintiff's security deposit.

130.    Attached to the emailed Notice Letter was the SODA. **Exhibit A.**

131.    Defendants prepared the SODA using Yardi software, and does so at each of the Florida Properties.

132.    The Notice Letter and SODA shows that Plaintiff Glasbrenner's $1,895.00 security deposit was already deducted and applied towards the $5,402.30 in alleged amounts owed to Defendants, and demanded that Plaintiff Glasbrenner pay an additional $3,900.52 on top of Defendants keeping Plaintiff's $1,895.00 security

deposit. **Exhibit A.**

133.     Plaintiff Glasbrenner paid all alleged amounts due in excess of her security deposit, while protesting those amounts owed, she paid out of fear of collections and credit score damage.

134.     Upon information and belief, it is Defendants' routine business practice to unlawfully claim/deduct/take possession of tenants' security deposits before the Fla. Stat. § 83.49(3)(a) 15-day objection period expires for all its tenants and without providing any FRLTA compliant Security Deposit Notice Letter within 30 days of a tenant's lease termination.

135.     Defendants cannot deduct or move Plaintiff Glasbrenner's security deposit out of the non-interest bearing security deposit bank account into a different bank account owned by Defendants or Defendants' subsidiaries until it unless it sent Plaintiff Glasbrenner a Security Deposit Notice Letter that complied with Fla. Stat. § 83.49(3)(a) within 30 days of lease termination and then Defendants waited for the 15 day objection period to expire. After the 15 day objection period expired, then Defendants could deduct and comingle Plaintiff Glasbrenner's security deposit monies because only after the 15 day objection period expired would Plaintiff Glasbrenner's security deposit monies become due to Defendants.

136.     Upon information and belief, Defendants do not send any certified mail notice letter including the required statutory language and does not provide any tenant 15 days to object before taking possession and control of the security deposit funds for

any of the properties Defendants own and manages in Florida.

137.    Defendants knew that it had to send Plaintiff Glasbrenner a certified mail notice letter that complied with Fla. Stat. § 83.49(3)(a) and wait for the 15 day objection period to expire before it could deduct and comingle Plaintiff Glassbrenner's security deposit monies because Defendants haves a specific provision in their lease that cites to Fla. Stat. § 83.49, and it had been on notice by the FTC of security deposit procedures and agreed to a stipulation before Plaintiff Glasbrenner's certified mailing was due.

138.    Defendants deducted and took possession of Plaintiff Glasbrenner's $1,895.00 security deposit prior to 15 days after Plaintiff Glasbrenner received a notice letter that was sent by certified mail within 30 days of her moving out.

139.    By doing so, Defendants removed Plaintiff Glasbrenner's $1,895.00 security deposit from the non interest bearing account that Defendants held Plaintiff Glasbrenner's deposit in and comingled Plaintiff Glasbrenner's security deposit into another bank account that Defendant THR Management or Defendant Invitation Homes Inc. owned prior to the 15 day objection period expiring and no objection was received.

140.    Fla. Stat. § 83.49(3)(b) prohibits Defendants from deducting Plaintiff Glasbrenner's $1,895.00 security deposit until after Plaintiff Glasbrenner failed to object within 15 days of receiving Defendants' notice letter:

> Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, **the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of**

41

**intention to impose a claim for damages.** The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

Fla. Stat.§ 83.49(3)(b)(emphasis added).

141.    Plaintiff Glasbrenner suffered damages by having her security deposit prematurely deducted from her prior to her 15 day statutory right objection period expiring and her making no objection.

142.    Fla. Stat. § 83.49(1)(a) prohibits Defendants from moving Plaintiff Glasbrenner's security deposit from the designated non-interest bearing account to Defendants' general operating accounts until "such moneys are actually due to the landlord."

> The landlord shall not comingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys *until* such moneys are actually due the landlord.

Fla. Stat. § 83.49(1)(a) (Emphasis added).

143.    To the extent that Defendants did send a certified mail to Plaintiff Glasbrenner's last known address and it was returned back to Defendants and/or was lost in transit, the FRLTA is clear that the 15 day objection period does not start until Plaintiff receives the certified mail notice. The burden is on Defendants to ensure that it pays attention to (a) whether Plaintiff Glasbrenner receives the letter and (b) the date Plaintiff Glasbrenner received the certified letter.

144.    Plaintiff Glasbrenner suffered damages from Defendants comingling her security deposit funds with the funds of Defendants prior to when Plaintiff's security

deposit funds were actually due to Defendants after the 15 day statutory right objection period expired and no objection was made.

**F. Plaintiff Neal's Facts**

145.    In late 2022 or early 2023, Plaintiff Neal came across Defendants advertisement for 727 Bryson Loop, Lakeland, FL, where Defendants advertised a rent of $1,985.

146.    Nowhere in the advertised rent price did Defendants indicate that there were additional mandatory fees and/or optional fees that would increase the rent price above $1,985.

147.    Based on that advertisement, Plaintiff Neal applied for the home and paid the non refundable application fee.

148.    However, when it was time to sign the 2023 Lease, Plaintiff Neal learned for the first time that his rent would actually be $2,034.95 per month, not $1,985.00 as advertised. **Exhibit F** ("2023 Neal Lease").

149.    As part of the $2,034.95, Plaintiff Neal paid a mandatory $40 Smart Home Fee monthly from 1/19/2023 through 1/18/2024, for a total amount of $480 of rent that was undisclosed in the advertised rent of $1,985.

150.    As part of the $2,034.95, Plaintiff Neal paid a mandatory $9.95 Air Filter Service Fee monthly from 1/19/2023 through 1/18/2024, for a total amount of $119.40, which was not disclosed in the advertised rent of $1,985.

151.    As part of the 2023 Neal Lease, Plaintiff Neal paid a $1,985.00 security

deposit to Defendants.

152.    Defendants deposited Plaintiff Neal's security deposit into a non interest bearing account.

153.    Plaintiff Neal signed a lease renewal agreement in 2024 that was set to terminate in January 2025. ("2024 Neal Lease").

154.    The 2024 Neal Lease contained the same mandatory $40 Smart Home Fee and $9.95 Air Filter Fee, and Plaintiff Neal paid those mandatory amounts monthly, which were more than the advertised price for his lease renewal.

155.    Plaintiff Neal's security deposit under the 2023 Lease was transferred to the 2024 Neal Lease and kept in Defendants' non interest bearing account.

156.    To the extent the Class Action Waiver in Plaintiff Neal's 2024 Lease is valid and enforceable, it only applies to the 2024 Neal Lease, not his previous lease.

157.    Plaintiff Neal's 2024 Lease purportedly includes a Class Action Waiver, which is unconscionable under the FRLTA because it takes away tenants' rights under the FRLTA and tenants have no choice to accept this after paying a non refundable application fee, there was no mention of the class action waiver in the advertised rent or on the application prior to paying the nonrefundable application fee.

158.    Plaintiff Neal's 2024 Lease purportedly includes a Class Action Waiver that is void and unenforceable under the FRLTA because it takes away tenants' ability to enforce their rights collectively under the FRLTA, which is normally one of the only ways tenants can find an attorney to bring a FRLTA claim due to the relatively small

amounts at issue, which limits tenants options to incur the large costs of hiring an attorney for way less in damages to be recovered.

159.   Additionally, Plaintiff Neal's 2024 Lease's Class Action Waiver is not enforceable because it takes away rights afforded under the FCCPA, which specifically contemplated class actions and class actions are referenced in the statute.

160.   On October 17, 2024, Plaintiff Neal provided Defendants a notice to vacate the 2024 Lease at the end of 2024 Lease term. **Exhibit H** ("Neal Notice to Vacate").

161.   When Plaintiff Neal moved out at the end of the 2024 Lease, he did not receive his security deposit back in full within 15 days of moving out, and did not receive a certified mail notice of intention to impose a claim upon his security deposit within 30 days of moving out at the address provided in the notice to vacate.

162.   Instead, Plaintiff Neal received an email notice of intention to impose a claim. **Exhibit I.**

163.   The Notice of Intent to impose a claim was sent to Plaintiff Neal more than 15 days after he vacated on 1/18/2025.

164.   Interestingly, Defendants' notice sent to Plaintiff Neal said that he was going to get back a proposed refund of $1,985, which was his entire deposit amount.

165.   If Defendants were going to return Plaintiff Neal's entire deposit in full, they should have sent him his deposit back within 15 days of lease termination.

166.   Defendants violate the FRTLA to the extent they intend on refunding

Plaintiff Neal his entire deposit because it was not returned to him within 15 days of moving out and has still not been returned. Plaintiff Neal is entitled to interest on this money from the 15th day onward.

167.    To the extent that Defendants seek to keep Plaintiff Neal's security deposit in full, Defendants failed to send a certified mail notice of intention to impose a claim upon Plaintiff's deposit within 30 days of moving out. Defendants must refund Plaintiff his deposit in full as a result of its failure to do this.

168.    Defendants commingled Plaintiff Neal's security deposit monies with Defendants monies when it took possession of Plaintiff Neal's security deposit after he objected.

169.    To the extent Defendants intended to return Plaintiff Neal's deposit in full, Defendants improperly commingled Plaintiff's Neals security deposit when they failed to return the deposit within 15 days of moving out.

170.    Plaintiff Neal wrote a written objection to Defendants after receiving the emailed notice letter.

171.    Defendants still took possession of Plaintiff Neal's security deposit even after Plaintiff Neal objected within 15 days of receiving the email notice of intention to impose a claim upon a deposit.

172.    If a tenant objects to a security deposit notice letter within 15 days of receiving a notice, Defendant Neal cannot take possession of those funds, they must stay in the non interest bearing account until a resolution is reached.

173.     To the extent that Defendants did send a certified mail to Plaintiff Neal's last known address and it was returned back to Defendants and/or was lost in transit, the FRLTA is clear that the 15 day objection period does not start until Plaintiff Neal receives the certified mail notice. The burden is on Defendants to ensure that it pays attention to (a) whether Plaintiff Neal receives the letter and (b) the date Plaintiff Neal received the certified letter.

174.     Plaintiff Neal suffered damages from Defendants comingling his security deposit funds with the funds of Defendants prior to when Plaintiff Neal's security deposit funds were actually due to Defendants after the 15 day statutory right objection period expired and no objection was made. In this case, an objection was made and Defendant still retained possession of the deposits and commingled the funds. When an objection is made, the monies should stay in the non interest bearing account until there is a resolution.

175.     Additionally, Plaintiff Neal's 2023 and 2024 Leases contained a $35 HOA Admin Fee for each violation, charge, or fine assessed due to Plaintiff Neal's failure to comply with any HOA Governing Documents or Applicable Law.

176.     Defendants were responsible for the maintenance of Plaintiff Neal's air conditioning under the 2023 and 2024 Leases.

177.     Plaintiff Neal submitted a work order that his air conditioner was broken and Defendants never repaired it.

178.     Plaintiff Neal was forced to put in window air condition units and was

charged a $35 HOA Admin Fee for Defendants receiving an HOA warning letter for the window units, which were prohibited under HOA rules.

179.    Another time, Plaintiff was charged a $35 HOA Admin Fee by Defendants and Defendants submitted a photo as evidence of the HOA violation that was not even Plaintiff's home.

180.    There are several instances of Defendant charging an HOA Fee when it was Defendant's fault that an HOA warning letter was sent to Defendant from Plaintiff's home conditions.

181.    Plaintiff suffered actual damages by paying mandatory HOA Admin Fees when Defendants were actually at fault or improperly assessed the HOA Admin Fee to Plaintiff.

182.    Plaintiff seeks a return of all HOA Admin fees paid.

### G. THE PREMATURE WITHHOLDING AND ILLEGAL COMINGLING OF SECURITY DEPOSITS ARE IMPROPER CONSUMER DEBT COLLECTIONS

183.    For each property Defendant Invitation Homes or its subsidiaries own in Florida, Defendant THR Management is in charge of the first round of collection efforts after tenants move out and there is an alleged balanced owed in which Defendants seeks to deduct the tenant's security deposit from and/or collect amounts allegedly owed in excess of the security deposit.

184.    Defendant THR Management is a debt collector under the FCCPA by attempting to or actually collecting debt allegedly owed by Plaintiff and other tenants

of properties it serves as the property manager of in Florida for amounts allegedly owed pursuant to lease agreements. For properties it manages, Defendant THR Management is collecting debt as the original creditor depending on its property management contract with the landlord. To the extent that the property management contract declares that Defendant should impose claims against security deposits and collect amounts alleged owed in excess of the security deposit after a tenant moves out, Defendant is collecting debt on behalf of the landlords, such as Defendant Invitation Homes

185.    The "debt" allegedly owed by Plaintiffs and tenants arises from lease agreements and alleged damages related to tenancies at properties managed in Florida, such as, late fees, delinquent rent, property damage, or charges.

186.    Plaintiff Glasbrenner was the subject of Defendant THR Management's debt collection communication when Defendant THR Management sent the Notice Letter to Plaintiff Glasbrenner via email and retained Plaintiff's security deposit.

187.    Plaintiff Neal was the subject of Defendant THR Management's debt collection communication when Defendant THR Management sent the Notice Letter to Plaintiff Neal via email and retained Plaintiff's security deposit.

188.    Defendant THR Management asserted a legal right to deduct Plaintiffs' security deposits, take possession of it, and transfer it out of the non-interest bearing security deposit bank account into another account owned by Defendant THR Management or Invitation Homes, Inc. prior to the expiration of Plaintiffs' 15 day objection period and no objection made, which were rights that did not presently exist

49

because Defendant THR Management failed to send a certified mail FRLTA compliant notice letter within 30 days of Plaintiffs moving out.

189.    Defendant THR Management knew that the legal right to deduct Plaintiffs' security deposits, take possession of it, and transfer it out of the non-interest bearing security deposit bank account into Defendant THR Managmeent's or Defendant Invitation Home Inc.'s bank account did not exist prior to the expiration of Plaintiff's 15 day objection period after receiving a certified mail FRLTA legally sufficient notice letter within 30 days of Plaintiffs' lease termination because Defendants' standard form lease agreement specifically declared that Defendants did not have a legal right to deduct Plaintiffs' security deposit until after the 15 day objection period and no objection received.

190.    Plaintiffs suffered actual damages in the form of (1) their security deposits being deducted before the 15 day objection period expired and no objections made and (2) their security deposits being comingled with Defendant THR Managmeent's or Defendant Invitation Homes other funds prior to when Plaintiffs security deposit were actually due to Defendants (after 15 day objection period with no objection), (3) the Notice Letter debt communication caused Plaintiff Glasbrenner to pay monies in excess of her security deposit.

191.    Plaintiffs and the Class seek their attorneys fees and costs under the FRLTA, FCCPA, and FDUTPA.

## V.            CLASS REPRESENTATION ALLEGATIONS

192.    Plaintiffs bring this action against Defendants individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) on behalf of the following Classes:

**Security Deposit Class:** During the applicable class period all persons in the State of Florida who (a) was a tenant at a property managed or owned by Defendants and (b) did not receive a certified mail notice of intention to impose a claim upon their deposit from Defendants within 30 days of moving out, and (c) had any portion of their deposit retained by Defendants.

**Full Deposit Return Class**- All persons in Florida who received a notice from Defendants that they would receive their deposit back in full, but Defendants failed to pay back the deposit in full within 15 days.

**Objection Class-** All persons in Florida who (a) objected to a Notice Letter from Defendants within 15 days of receiving it, and (b) had Defendants moved their security deposit funds out of the non-interest bearing account and into one of Defendants operating accounts.

**HOA Admin Fee Class-** All persons in Florida who paid an HOA Fee for a HOA violation that resulted from (a) an unfulfilled maintenance request by Defendants or (b) was charged to the wrong tenant.

**Florida Fee Class**- All persons in Florida who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**California Fee Class**- All persons in California who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Georgia Fee Class** - All persons in Georgia who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**North Carolina Fee Clas**s- All persons in North Carolina who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Illinois Fee Class-** All persons in Illinois who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Texas Fee Class**- All persons in Texas who paid a Smart Home Fee and/or Air Filter

Fee and/or Internet Package Fee to Defendants.

**Colorado Fee Class**- All persons in Colorado who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Nevada Fee Class**- All persons in Nevada who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Minnesota Fee Class**- All persons in Minnesota who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Tennessee Fee Class**- All persons in Tennessee who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants.

**Arizona Fee Class**- All persons in Arizona who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants

**Washington Fee Class**- All persons in Washington who paid a Smart Home Fee and/or Air Filter Fee and/or Internet Package Fee to Defendants

Collectively the ("Classes")

193.    Class Period. The Class Periods shall be defined from the date of the filing of this complaint, back to any time such the Court deems appropriate, including tolling.

194.    The following are excluded from the Classes: Defendants and any of their current or former officers, directors, shareholders, agents, employees, or affiliates, all counsel of record in the action, as well as any judge or magistrate presiding over this case and their immediate family members, any individuals who have previously signed settlements or releases with Defendants for the claims brought by the Classes. For Security Deposit Class, any induvial who Defendants have a certified mail receipt showing a Notice Letter was received by the tenant via certified mail within 30 days of

moving out.

195.    **Numerosity.** Plaintiffs are unable to state the exact number of members of the Classes because that information is solely in the possession of Defendants. However, the exact number of class members, including the names and addresses of all class members, will be easily ascertained through a review of Defendants' business records.  The putative Classes individually includes many tenants due to the number of properties that Defendant THR Management manages within Florida and other states, with Defendant Invitation Homes, Inc's subsidiaries owning over 80,000 homes that are managed by Defendant THR Management. Therefore, the putative Classes are so numerous that joinder of all members would be impracticable.

196.    **Commonality.** Questions of law and fact common to the Classes exist and predominate over questions affecting only individual members. Specifically, the predominating common questions include:

a.    Whether Defendants violated the FRLTA § 83.49(3) by deducting tenants' security deposits and taking control and possession of those funds prior to the 15 day expiration period expiring in the SODA;

b.    Whether Defendants violated the FRLTA by comingling tenants' security deposit monies with Defendants' other monies prior to expiration of the 15 day objection period, as shown in the SODA;

c.    Whether Defendants' attempt to seek a setoff against tenant security deposits without first providing a certified mail notice letter in compliance with FRLTA §

83.49(3) and failing to wait for the 15-day objection period to expire before taking possession of those amounts, makes its collection efforts unlawful in violation of FCCPA § 559.72(9);

d.      Whether Defendants' comingling of tenants' security deposit monies out of the dedicated security deposit bank account into Defendant's or its subsidiaries other bank accounts without first providing a security deposit letter in compliance with FRLTA§ 83.49(3) and waiting for the 15-day objection period to expire, makes its collection efforts unlawful in violation of FCCPA § 559.72(9);

e.      Whether the Defendants sent certified mail Notice Letters violates the FRLTA and FCCPA;

f.      Whether Defendants violated the unfair and deceptive trade practices act laws in the following states California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington for members of the Fee Class;

g.      Whether Defendants failed to return deposits within 15 days of moving out to those who were to receive their security deposit back in full;

h.      Whether Defendants improperly charged and collected HOA Admin Fees;

i.      Whether injunctive relief is appropriate;

j.      Whether the members of the Classes have sustained damages, and if so, the proper measure of damages, including actual and statutory.

54

197.    **Typicality.** The claims asserted by the named Plaintiffs in this action are typical of the claims of the members of the Classes because, upon information and belief, Defendants use standardized form documents and procedures in their business practices. The claims of Plaintiffs and of the Classes originate from the same conduct, practice, and procedure, on the part of Defendants. Plaintiffs possess the same interests and has suffered the same injuries as each putative class member.

198.    **Adequacy.** The named Plaintiffs will fairly and adequately represent and protect the interest of the members of the Classes because they have no interest antagonistic to the Classes they seek to represent, and because the adjudication of their claims will necessarily decide the identical issues for other class members. Whether Defendants' practice of failing to provide adequate disclosures, charging deceptive fees, and failing to comply with security deposit claim laws, and debt collection practices under FRLTA, FCCPA, and state UDAPs are common issues that will be decided for all other consumers with similar leases and lease applications with Defendants. There is nothing peculiar about Plaintiffs' situations that would make them inadequate as a Class Representative. Plaintiffs have retained counsel competent and experienced in both class action, FRLTA, UDAP, and FCCPA litigation.

199.    **Injunctive Relief.** The elements of Rule 23(b)(2) are met. Defendants will continue to commit the unlawful practices alleged herein, and members of the Classes will remain at an unreasonable disadvantage due to the business practices. Defendants have acted and refused to act on grounds that apply generally to the Classes

such that final injunctive relief is appropriate respecting the Classes as a whole.

200.    **Predominance.** The elements of Rule 23(b)(3) are met. The common questions of law and fact enumerated above predominate over the questions affecting only individual Class and Subclass members, and a class action is the superior method for the fair and efficient adjudication of this controversy. The likelihood that individual members of the Classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation. Serial adjudication in numerous venues is not efficient, timely, or proper. Judicial resources will be unnecessarily depleted by resolution of individual claims. Joinder on an individual basis of hundreds or thousands of claimants in one suit would be impracticable or impossible. Individualized rulings and judgments could result in inconsistent relief for similarly-situated plaintiffs.

201.    **Superiority.** A class action is superior to other methods for the fair and efficient adjudication of this controversy because the damages suffered by each individual member of the Classes will be relatively modest, compared to the expense and burden of individual litigation.  It would be impracticable for each member of the Classes to seek redress individually for the wrongful conduct alleged herein because the cost of such individual litigation would be cost prohibitive, the individual damages are limited.  It would be difficult, if not impossible, to obtain counsel to represent Plaintiffs on an individual basis for such small claims. In addition, if the consumer were to utilize the FRLTA, FCCPA, or any UDPA law, the same issues would arise, including the need to pay for an attorney and the cost of filing suit and serving

Defendants. This is why both the FRLTA, state UDAPs, and the FCCPA provide for attorney fees and costs.

## TOLLING OF THE STATUTE OF LIMITATIONS

202.    More importantly, the vast majority of members of the Classes are not aware the Defendants' policies violate the various laws and a class action is the only viable means of adjudicating their rights.  There will be no difficulty in the management of this litigation as a class action as the legal issues affect a standardized pattern of conduct by Defendants and class actions are commonly used in such circumstances and Defendants have the records necessary to determine class membership and damages.

203.    The UDAP claims alleged herein accrued upon the discovery of the hidden fees which manifested themselves when the FTC did an investigation. Because the fees are hidden and Defendants failed to disclose the true rent price in advertisements, Plaintiffs and the Classes and did not discover, and could not have discovered, the hidden fees through reasonable and diligent investigation. Thus, any applicable statute of limitations has been tolled by Defendants' knowledge, misrepresentation, and/or concealment and denial of the facts as alleged herein.

204.    Plaintiffs and members of the Classes could not have reasonably discovered the fees before they manifested. As a result of Defendants' active and continuing concealment of the hidden fees and/or failure to inform Plaintiffs and the Classes, any and all statute of limitations and/or statute of repose otherwise applicable

to the allegations herein have been tolled.

## COUNT I

### VIOLATION OF THE FLORIDA RESIDENTIAL LANDLORD AND TENANT ACT, FIA. STAT.§ 83.49(3)(a); §83.49(3)(b); Fla. Stat. § 83.49(1)(a) ("FRLTA")
### On behalf of Plaintiffs and the Security Deposit Class

205.    Plaintiffs, on behalf of themselves, and all others similarly situated, repeat and re-allege paragraphs 1 through 204, as if fully set forth herein.

206.    As a residential property management company and owner, the relationship between Defendant THR Management and its tenants is governed by the Florida Residential Landlord Tenant Act, Fla. Stat. Chapter 83 et seq. ("FRLTA") because Defendant acts as the agent of owner of the Florida Properties.

207.    Defendant Invitation Homes is a landlord under the FRLTA because it is the owner of the Florida Properties.

208.    Alternatively, because Defendant THR Management's employees are the ones who sign the leases between tenants of the Florida Properties, Defendant THR Management is a landlord because it is the lessor.

209.    Fla. Stat. § 83.44 states that every rental agreement imposes an obligation of good faith in the performance thereof by the landlord or property manager.

210.    Fla. Stat. § 83.54 gives Plaintiffs and the Security Deposit Class the ability to enforce their rights pursuant to the FRLTA by civil action.

211.    After a tenant moves out, Fla. Stat. § 83.49(3)(a) requires landlords to either return the deposit in full within 15 days of moveout or send a certified mail notice of intent to impose a claim against a tenant's security deposit within 30 days of lease termination:

> (a)    Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or his intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

> This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to  (landlord's address) .

212.    Fla. Stat. § 83.49(3)(a) is clear and unambiguous regarding the penalty for a landlord or property management company's noncompliance with the certified mail notice requirement:

> If the landlord fails to give the required notice within the 30day period, he or she forfeits the right to impose a claim upon the Security Deposit and may not seek a setoff against the deposit but may file an action for damages **after return of the deposit.**

Fla. Stat. § 83.49(3)(emphasis added)

213.    When a tenant receives a certified mail notice letter within 30 days of lease termination, Fla. Stat. § 83.49(3)(b) provides the tenant 15 days to object to

the claims made against their security deposit. If the tenant does not object to the claim, under Fla. Stat. §83.49(3)(b), then and only then can the landlord or property management company take possession of the tenant's security deposit monies.

214.    In other words, the landlord or property management company cannot move the security deposit monies out of the non-interest bearing account and into a different bank account to be applied towards an outstanding balance allegedly owed in the notice letter at all until after a FRLTA compliant notice letter has been sent by certified mail and the 15-day objection period has expired. The FRLTA clarifies this point as follows:

> (b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, **the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages.** The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

Fla. Stat. 83.49(3)(b)(emphasis added)

215.    Additionally, Fla. Stat. § 83.49(1)(a) prevents landlords and property management companies from prematurely transferring money from landlord/property management company's security deposit bank account to any other bank account until that the security deposit money is actual due to the landlord or property management company:

60

> The landlord shall not comingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys **until** such moneys are actually due the landlord.

(emphasis added)

216.    Plaintiff Glasbrenner paid Defendants a $1,895 security deposit when Defendant THR Management was carrying out its property management duties as an agent of the landlord and Defendant Invitation Homes as the owner of the property.

217.    Plaintiff Glasbrenner provided a forwarding address to Defendants on Defendants' notice to vacate form more than 7 days prior to her vacating the property. **Exhibit E**.

218.    Defendants sent Plaintiff Glasbrenner and the Security Deposit Class Members a Notice Letter by e-mail and/or regular U.S. mail, but never sent Plaintiff Glasbrenner and Security Deposit Class Members a certified mail Notice Letter.

219.    Plaintiff Neal paid a security deposit to Defendants.

220.    Plaintiff Neal provided his forwarding address to Defendants in their notice to vacate form. **Exhibit H.**

221.    Within 30 days of moving out, Plaintiff Neal never received a certified mail notice of Defendants intent to impose a claim on his deposit and the required disclosures.

222.    Plaintiff Neal has yet to receive his deposit back.

223.    Thus, Plaintiffs and Class Members never received a certified mail Notice Letter, as required by Fla. Stat. § 83.49(a), and Defendants are required to return the deposit in full to each Security Deposit Class Member, as required by Fla. Stat. § 83.49(1)(a). Defendants then have the burden to go collect amounts it alleges are owed, as opposed to Security Deposit Class Members having the burden to fight Defendants for amounts that were deducted and kept by Defendants, when Defendants already had their money.

224.    Defendants took control and possession of Plaintiffs' and Security Deposit Class Members' security deposits prior to sending a certified mail notice letter pursuant to Fla. Stat. § 83.49(3)(a), and prior to waiting for the 15-day objection period to expire, as shown in Plaintiff Glasbrenner's SODA. *See* **(Exhibit A).** Fla. Stat. § 83.49(3)(b) is clear that security deposit monies are not due to a landlord or property management company (agent of landlord) until after the 15-day objection period has lapsed without any objection from the tenant.

225.    Here, the 15-day objection period never even began to run because Defendants failed to send a FRLTA legally sufficient notice letter by certified mail at all to Plaintiffs and the Class.

226.    Instead, Defendants sent e-mails and/or regular U.S. mail Notice Letters to tenants at all the properties it managed and owned in Florida.

227.    Plaintiffs only received an e-mail.

228.    By doing so Defendants comingled Plaintiffs' and Class Members

monies before such monies were actually due to Defendants in violation of Fla. Stat. § 83.49(1)(a).

229.    Therefore, Defendants violated Fla. Stat. § 83.49(3)(b) and Fla. Stat. § 83.49(1)(a) by taking the tenant security deposits prematurely. And, Defendants violated Fla. Stat.§ 83.49(3)(a) by failing to send a notice letter by certified mail that included all required disclosures in Fla. Stat. § 83.49(3)(a) within 30 days of lease termination for Plaintiffs and all Security Deposit Class Members.

230.    Plaintiffs and the Security Deposit Class suffered actual damages by Defendants equal to the amount of any security deposits withheld, plus interest, and any amounts paid to Defendants after receiving a Notice Letter that was not sent by certified mail within 30 days of moving out.

231.    In accordance with Fla. Stat. § 83.48 and Fla. Stat. § 83.48(3)(c), Plaintiffs and the Security Deposit Class are entitled to attorney's fees and costs.

## COUNT II

### VIOLATION OF THE FLORIDA RESIDENTIAL LANDLORD AND TENANT ACT, FIA. STAT.§ 83.49(3)(a); §83.49(3)(b); Fla. Stat. § 83.49(1)(a) ("FRLTA")
### On behalf of Plaintiff Neal and the Full Deposit Return Class

232.    Plaintiff Neal, on behalf of himself, and all others similarly situated, repeat and re-allege paragraphs 1 through 204, as if fully set forth herein.

233.    As a residential property management company and owner, the relationship between Defendant THR Management and its tenants is governed by the

Florida Residential Landlord Tenant Act, Fla. Stat. Chapter 83 et seq. ("FRLTA") because Defendant acts as the agent of owner of the Florida Properties.

234.    Defendant Invitation Homes is a landlord under the FRLTA because it is the owner of the Florida Properties.

235.    Alternatively, because Defendant THR Management's employees are the ones who sign the leases between tenants of the Florida Properties, Defendant THR Management is a landlord because it is the lessor.

236.    Fla. Stat. § 83.44 states that every rental agreement imposes an obligation of good faith in the performance thereof by the landlord or property manager.

237.    Fla. Stat. § 83.54 gives Plaintiff and the Security Deposit Class the ability to enforce their rights pursuant to the FRLTA by civil action.

238.    After a tenant moves out, Fla. Stat. § 83.49(3)(a) requires landlords to either return the deposit in full within 15 days of moveout or send a certified mail notice of intent to impose a claim against a tenant's security deposit within 30 days of lease termination:

> (a)    Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or his intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to  (landlord's address) .

239.    Additionally, Fla. Stat. § 83.49(1)(a) prevents landlords and property management companies from prematurely transferring money from landlord/property management company's security deposit bank account to any other bank account until that the security deposit money is actual due to the landlord or property management company:

The landlord shall not comingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys **until** such moneys are actually due the landlord.

(emphasis added)

240.    Plaintiff Neal paid Defendants a security deposit when Defendant THR Management was carrying out its property management duties as an agent of the landlord and Defendant Invitation Homes as the owner of the property.

241.    After moving out, Plaintiff Neal received an email notice of intention to impose a claim that stated that Plaintiff Neal would be receiving his deposit back in full.

242.    However, Plaintiff Neal and Full Deposit Return Class did not receive their security deposits back in full within 15 days of moving out, as required

by the FRLTA.

243.    Defendants took control and possession of Plaintiff Neal and Full Deposit Return Class members' deposits for every day after the 15th day of them moving out.

244.    By doing so Defendants comingled Plaintiff Neal's and Full Deposit Return Class Members monies before such monies were actually due to Defendants in violation of Fla. Stat. § 83.49(1)(a).

245.    Therefore, Defendants violated Fla. Stat. § 83.49(3)(b) and Fla. Stat. § 83.49(1)(a) by taking the tenant security deposits prematurely.  And, Defendants violated Fla. Stat.§ 83.49(3)(a) by failing to return security deposits in full to Plaintiff Neal and Full Deposit Return Class members.

246.    Plaintiff Neal and Full Deposit Return Class members suffered actual damages by Defendants equal to their full security deposit, plus interest for each day it was held after the 15th day of moving out

247.    In accordance with Fla. Stat. § 83.48 and Fla. Stat. § 83.48(3)(c), Plaintiff Neal and the Full Deposit Return Class are entitled to attorney's fees and costs.

### COUNT III
### Violation of Fla. Stat. § 83.49(3)(a) and (b) and Fla. Stat. § 83.49(1)(a)
### On behalf of Plaintiff Neal and the Objection Class

248.    Plaintiff Neal, on behalf of himself, and all others similarly situated, repeat and re-allege paragraphs 1 through 204, as if fully set forth herein.

249.    After a tenant moves out, Fla. Stat. § 83.49(3)(a) requires landlords to either return the deposit in full within 15 days of moveout or send a certified mail notice of intent to impose a claim against a tenant's security deposit within 30 days of lease termination:

(a)    Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or his intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to  (landlord's address) .

250.    Plaintiff Neal and the Objection Class received a notice from Defendants that Defendants intended to impose a claim upon their deposit.

251.    Plaintiff Neal and the Objection Class objection within 15 days of receiving the deposit.

252.    The landlord or property management company cannot move the security deposit monies out of the non-interest bearing account and into a different bank account to be applied towards an outstanding balance allegedly owed in the notice letter at all until after a FRLTA compliant notice letter has been sent by

certified mail and the 15-day objection period has expired and no objection is made.

The FRLTA clarifies this point as follows:

> (b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, **the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages.** The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

> Fla. Stat. 83.49(3)(b)(emphasis added)

253.    Here, Defendants moved the deposits out of the non interest bearing account even though objections were made by Plaintiff Neal and the objection class.

254.    The FRTLA is clear that the funds cannot be moved unless no objection is made within 15 days of receiving the notice.

255.    If an objection is made the funds must remain in the non interest bearing account until there is a resolution.

256.    Plaintiff Neal and the Objection Class suffered damages to the extent any interest was earned on their deposits for the time it was removed out of the non interest bearing account.

257.    Plaintiff Neal and the Objection Class seek their attorneys fees and costs under the FRLTA.

**COUNT IV**
**Breach of Contract**
**On Behalf of Plaintiff Neal and the HOA Admin Class**

68

258. Plaintiff Neal, on behalf of himself, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

259. Plaintiff Neal had a 2023 and 2024 Lease with Defendants that required Plaintiff Neal and HOA Admin Fee Class members to pay HOA Admin Fees for violations of HOA rules and regulations. **Exhibit F and G.**

260. Defendants imposed several HOA Admin Fees upon Plaintiff Neal that were the result of Defendants' failure to provide maintenance required of them under the 2023 and 2024 Leases.

261. Defendants also charged and collected HOA Admin Fees from Plaintiff Neal and the HOA Admin Fee class for violations that were for a different home and were incorrectly imposed on Plaintiff Neal and the HOA Admin Fee Class.

262. Defendants 2023 and 2024 Leases required Defendants to provide air conditioning maintence for Plaintiff.

263. Plaintiff requested air condition maintenance on Defendants' portal and never fixed the air conditioning.

264. Due to the temperature of Florida, to make the home habitable, Plaintiff Neal had to install window AC units, which violated the HOA rules, leading to a violation letter being sent to Defendants.

265. Additionally, Plaintiff Neal was charged an HOA Fee by Defendants for a yard related matter, and in support of the HOA Admin Fee, Defendants sent

Plaintiff Neal a photo of a home that was not his.

266.    It is a breach of contract for Defendant to fail to provide air condition maintenance and then subsequently charge an HOA Admin Fee for Plaintiff self-remedying the situation.

267.    It is a breach of contact for Defendants to charge and collect HOA Admin Fees from Plaintiff and HOA Admin Class Members when the HOA violation occurred at a different home.

268.    As a proximate result of Defendants' breach of contract with Plaintiff Neal and the HOA Admin Fee Class, Plaintiff Neal and HOA Admin Class suffered actual damages in the amounts of HOA Admin Fees paid to Defendants.

269.    Plaintiff Neal and the HOA Admin Fee class seek their attorneys fees and costs under their Leases.

## COUNT IV
## VIOLATION OF THE FLORIDA CONSUMER COLLECTION
## PRACTICES ACT FLA. STAT.§ 559.55 et seq. ("FCCPA")
### On Behalf of Plaintiffs and the Security Deposit Class

270.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

271.    The recognition of abusive, deceptive, and unfair practices by those that collect debts, the Florida legislature passed Fla. Stat.§§ 559.55 -559.785, known as the Florida Consumer Collections Practices Act ("FCCPA").

272.    The FCCPA defines "Debt" or "consumer debt" as "any obligation or

alleged obligation of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment." Fla. Stat. § 559.55.

273.    For purposes of the FCCPA, monies allegedly due, over and above a security deposit, for alleged damage to an apartment are considered a "debt." *Jonquinta Edwards v. New Three Seasons, LTD dlb/a Three Seasons Mobile Home Village,* Case No. 2019-SC-3609 (Fla. 4th Jud. Cir. Nov. 6, 2019).

274.    "Debt collector" means any person who uses any instrumentality of commerce within this state, whether initiated from within or outside this state, in any business the principal purpose of which is the collection of debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."

275.    For purposes of the FCCPA, when Defendants engage in the practice of collecting debts, including damages related to the properties that it manages, its collections practices are governed by the FCCPA. *Jonquinta Edwards v. New Three Seasons, LTD dlb/a Three Seasons Mobile Home Village,* Case No. 2019-SC- 3609 (Fla. 4th Jud. Cir. Nov. 6, 2019) (granting a plaintiff summary judgment under the FCCPA for a landlord's debt collections practice in violation of the FRLTA).

276.    Defendant THR Management is a debt collector under the FCCPA by attempting to or actually collecting debt allegedly owed by Plaintiff and other tenants

of properties in owns or serves as the property manager of in Florida during the Class period for amounts allegedly owed pursuant to lease agreements. For properties it manages, Defendant is collecting debt as the original creditor depending on its property management contract with the landlord. To the extent that the property management contract declares that Defendant THR Management should impose claims against security deposits and collect amounts alleged owed in excess of the security deposit after a tenant moves out, Defendant THR Management is collecting debt on behalf of the owner.

277.    Defendant Invitation Homes is a debt collector as the original creditor of the debt.

278.    At all times material herein, Plaintiffs and the Security Deposit Class members were "debtors" or "consumers" as defined by Fla. Stat. § 559.55(8).

279.    At all times material herein, Plaintiffs' security deposit debt and the alleged amounts owed under lease agreements and damage claims were debt of the Security Deposit Class members were "debts" or "consumer debts" as defined by Fla. Stat. § 559.55(6).

280.    At all times material herein, Defendants were a "person" as referred to under Fla. Stat. § 559.72.

281.    Among the FCCPA's enumerated prohibitions, Fla. Stat. §559.72(9) states that "no person shall"... "[c]laim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, **or assert the existence of some other**

**legal right when such person knows that the right does not exist."** Fla. Stat. §559.72(9).(emphasis added).

282.    The FRLTA also includes specific provisions for how landlords and property management companies are to make claims against a tenant's security deposit. Specifically, Fla. Stat.§ 83.49(3)(a) of the FRLTA states:

(a)    Upon the vacating of the premises for termination of the lease, if the landlord does not intend to impose a claim on the security deposit, the landlord shall have 15 days to return the security deposit together with interest if otherwise required, or the landlord shall have 30 days to give the tenant written notice by certified mail to the tenant's last known mailing address of his or his intention to impose a claim on the deposit and the reason for imposing the claim. The notice shall contain a statement in substantially the following form:

This is a notice of my intention to impose a claim for damages in the amount of  upon your security deposit, due to . It is sent to you as required by s. 83.49(3), Florida Statutes. You are hereby notified that you must object in writing to this deduction from your security deposit within 15 days from the time you receive this notice or I will be authorized to deduct my claim from your security deposit. Your objection must be sent to  (landlord's address)

Fla. Stat. § 83.49(3)(a) ("Security Deposit Notice Letter)

283.    Furthermore, Fla Stat declares:

(b) Unless the tenant objects to the imposition of the landlord's claim or the amount thereof within 15 days after receipt of the landlord's notice of intention to impose a claim, **the landlord may then deduct the amount of his or her claim and shall remit the balance of the deposit to the tenant within 30 days after the date of the notice of intention to impose a claim for damages.** The failure of the tenant to make a timely objection does not waive any rights of the tenant to seek damages in a separate action.

Fla. Stat. 83.49(3)(b)(emphasis added)

284.    Accordingly, Fla. Stat. 83.49(3)(b) only allows for the landlord or property management company to deduct the security deposit out of the non-interest bearing account if a notice letter was sent under Fla. Stat. 83.49(3)(a) by certified mail, and the 15 day objection period expired without objection by the tenant.

285.    Here, Defendants failed to (a) return the deposit in full within 15 days of moving out and (b) send a certified mail letter to Plaintiffs and the Security Deposit Class Members within 30 days of moving out, and Plaintiffs and Class members had their security deposits moved out of the non interest bearing bank accounts and into Defendants' bank account in violation of Fla. Stat. 83.49(3)(b).

286.    Additionally, Fla. Stat. § 83.49(1)(a) prevents landlords and property management companies from prematurely transferring money from landlord/property management company's security deposit bank account to the landlord/property management's general operating account until that the security deposit money is actual due to the landlord or property management company:

> The landlord shall not comingle such moneys with any other funds of the landlord or hypothecate, pledge, or in any other way make use of such moneys *until* such moneys are actually due the landlord.

287.    Here, Defendants' systematic policy is to not provide the required certified mail notice letter before taking possession of Plaintiffs' and Class members' security deposits.

288.    Defendants' practice of deducting claims from the security deposit,

completely withholding the deposits, and/or comingling funds out of the security deposit bank account without first providing a certified mail notice letter under Fla. Stat. §83.49(3)(a) violates the FCCPA, Fla. Stat. §559.72(9) as it asserts a legal right that Defendants did not have. *Jonquinta Edwards v. New Three Seasons, LTD dlb/a Three Seasons Mobile Home Village,* Case No. 2019- SC-3609 (Fla. 4th Jud. Cir. Nov. 6, 2019) (holding that withholding a tenant's security deposit without complying with the notice requirements of the FRLTA is a violation of the FCCPA).

289.    Furthermore, § 83.49(3)(a) provides that Defendants cannot "seek a setoff against the deposit" if the required certified mail notice letter is not provided. Thus, Defendants unlawfully seeks a setoff against the security deposit of Plaintiffs and the Security Deposit Class as it deducts and comingles the total amount and/or part of the security deposit before it had any legal right to those funds.  As a result, Defendants assert a legal right that Defendants did not have because at the time Defendants moved Plaintiffs and the Security Deposit Class members' security deposits out of the dedicated non-interest bearing security deposit bank account into another bank account, a certified mail notice letter had not been given by certified mail within 30 days of lease termination and the 15-day objection period had not expired after receiving a certified mail notice letter.

290.    Defendants had full knowledge of the FRLTA as a property management company and landlord that handles thousands of residential security deposits in Florida

75

and cannot claim ignorance of the law. Additionally, Defendants were put on notice by the FTC that its security deposit practices were not legally compliant, and Defendants were required to revisit their practices, which should have included its certified mailing practices. Defendants also included FRLTA certified mail requirement language in its own lease agreement with Plaintiffs and the Security Deposit Class. Defendants had no right under the FCCPA to deduct and comingle Plaintiff's and the Class members' security deposits.

291.    The FCCPA is a strict liability statute and therefore, Defendants should be held liable from its policy of collecting deposits without proper notice.

292.    As a direct and proximate result of Defendants' FCCPA violation, Plaintiffs and the Security Deposit Class suffered actual damages in the form of security deposits withheld by Defendant and statutory interest on such amounts.

293.    Plaintiffs and the Security Deposit Class are also entitled to additional statutory damages of $1,000 per class member and attorney's fees and costs pursuant to Fla. Stat. § 559.77(2).

## COUNT V
## Florida Deceptive and Unfair Trade Practices Act
## On Behalf of Plaintiffs and the Florida Fee Class

294.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

295.    The stated purpose of the Florida Deceptive and Unfair Trade Practices

Act, Fla. Stat. §§ 501.201, *et seq.* (the "Act" or "FDUTPA") is to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

296.    Plaintiffs and all Class Members are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by Fla. Stat. §§501.203(7) and (8), respectively. Florida Statute §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

297.    In violation of the FDUTPA, the Defendants employed deception, false promise, misrepresentation and the knowing concealment, suppression, or omission of material facts in their sale, marketing, and/or advertisement of rent prices, including information Defendants' websites, third-party websites, and the material facts as set forth in the following paragraphs.

298.    Defendants represented the rent price to Plaintiffs and consumers to be one price, and did not disclose that there would be additional mandatory or optional fees in a reasonably accessible place when consumers reviewed Defendants advertised rent price.

299.    Plaintiffs and Florida Fee Class members then paid a nonrefundable application fee and filled out an application that listed the rent price as the advertised

price, and made no mention of mandatory or optional fees.

300.    Only when Plaintiffs and Florida Fee Class members signed the lease did they see for the first time that there was a mandatory Smart Home Fee, Air Filter Fee, and Internet Package Fee, which was after they paid the nonrefundable application fee.

301.    The Defendants' concealment, suppression, or omission of material facts as alleged herein constitutes unfair, deceptive and fraudulent business practices within the meaning of the FDUTPA.

302.    According to the definition of "violation of this part," in §501.203(3)(a) a violation of FDUTPA can occur when federal administrative rules promulgated by the Federal Trade Commission pursuant to the FTC act are violated. Along these lines, the 11th Circuit has confirmed that §501.203(3)(a) of FDUTPA creates a private cause of action for violation of an FTC rule even though none exists under federal law.

303.    The FTC brought a complaint against Defendants for violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a) and the FTC and Defendants entered into a stipulated order permanent injunction, monetary judgment and other relief based on that complaint.

304.    Thus, the allegations made in the FTC's complaint against Defendants for violations of 15 U.S.C. § 45(a) amount to per se violations of FDUTPA.

305.    Reasonable consumers would have been misled by Defendants' representation of the price of rent in the advertisement and applications.

306.    As a direct and proximate cause of the violation of the FDUTPA, described herein, Plaintiffs and the Florida Fee Class members have been injured in that they were required to pay a higher monthly rent due to mandatory fees based on misrepresentations and nondisclosure of the material facts alleged herein, including but not limited to, nondisclosure of the mandatory fees in the advertisement of rent pricing. Thus, Plaintiffs and class members have actual damages for the monthly fees paid to Defendants.

307.    Defendants unlawful conduct is continuing with no indication that its unlawful conduct will cease.

308.    Said acts and practices on the part of Defendants were and are illegal and unlawful pursuant to Fla. Stat. § 501.204.

309.    Plaintiffs and the Florida Fee Class seek their attorneys fees and costs under FDUTPA.

310.    Plaintiffs and the Florida Fee Class seek injunctive relief to stop Defendants' practices.

**COUNT VI**
**Georgia Uniform Deceptive Practices Act (Ga. Code § 10-1-370 et seq.)**
**On Behalf of Plaintiffs and the Georgia Fee Class**

311.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

312.    The Georgia Uniform Deceptive Practices Act (Ga. Code § 10-1-370 et

seq.) ("GUDPA") provides that unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are unlawful. (Ga. Code § 10- 1-393(a).)

313.    Defendant's policy and practice with respect to advertising and marketing its rent price is unfair under the GUDPA because it is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, including having a great and deleterious effect on its victims and it has no legal justification. Specifically, at least 10,000 individuals rent homes from Defendant in Georgia, and are subject to Defendant's illegal rental pricing scheme. These mandatory fees have caused Georgia residents to pay millions in undisclosed fees.

314.    Plaintiffs and Georgia Fee class members were aggrieved by and have suffered injury in fact and lost money or property pursuant to the GUDPA, as they were charged undisclosed mandatory fees.

315.    As a result of these unlawful business acts and practices, Defendant has reaped unfair benefits and illegal profits, at the expense of Plaintiffs and all similarly situated tenants and former tenants. Plaintiffs and Georgia Fee Class members are therefore entitled to an order of damages, treble damages, attorney's fees, and court costs under the GUDPA.

**COUNT VII**
**California Business & Professions Code § 17200, et seq.**
**On Behalf of Plaintiffs and the California Fee Class**

316.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

317.    California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, prohibits any unlawful, unfair, or fraudulent business act or practice.

318.    Defendants have engaged in business practices that are:

a. Unlawful because they violate Cal. Civ. Code § 1750, et seq., and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

319.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the California Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

**COUNT VIII**
**VIOLATION OF N.C. GEN. STAT. § 75-1.1**
**On Behalf of Plaintiffs and the North Carolina Fee Class**

320.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

81

321.    N.C. Gen. Stat. § 75-1.1 et seq. prohibits any unlawful, unfair, or fraudulent business act or practice.

322.    Defendants have engaged in business practices that are:

a. Unlawful because they violate N.C. Gen. Stat. § 75-1.1 et seq., and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

323.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the North Carolina Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

## COUNT IX
**Illinois' Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, et seq.)**
**On Behalf of Plaintiffs and the Illinois Fee Class**

324.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 88, as if fully set forth herein.

325.    The Illinois' Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1, et seq.) prohibits any unlawful, unfair, or fraudulent business act or

practice.

326.    Defendants have engaged in business practices that are:

a. Unlawful because they violate 815 ILCS 505/1, et seq., and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

327.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Illinois Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

**COUNT X**
**Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code § 17.41, et seq.)**
**On Behalf of Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Fee Classes.**

328.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

329.    The Texas Deceptive Trade Practices-Consumer Protection Act (Tex.

Bus. & Com. Code § 17.41, et seq.) prohibits any unlawful, unfair, or fraudulent business act or practice.

330. Defendants have engaged in business practices that are:

a. Unlawful because they violate Tex. Bus. & Com. Code § 17.41, et seq., and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

331. Defendants' offices that created, implemented, and benefited from the policies in regards to the advertisement of the deceptive rent prices and drip pricing of mandatory fees originated from Defendants offices in Texas that impacted Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Fee Classes.

332. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Class have suffered economic harm and are entitled to restitution and injunctive relief.

## COUNT XI
### Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, et seq.)
### On Behalf of Plaintiffs and the Colorado Fee Class

333.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

334.    The Colorado Consumer Protection Act (Colo. Rev. Stat. § 6-1-101, et seq.) prohibits any unlawful, unfair, or fraudulent business act or practice.

335.    Defendants have engaged in business practices that are:

a. Unlawful because they violate Colo. Rev. Stat. § 6-1-101, et seq., and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

336.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Colorado Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

### Count XII
### Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, et seq.)
### On Behalf of Plaintiffs and the Nevada Fee Class

337.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

338.    The Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. § 598.0903, et seq.) prohibits any unlawful, unfair, or fraudulent business act or practice.

339.    Defendants have engaged in business practices that are:

a. Unlawful because they violate Nev. Rev. Stat. § 598.0903, and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

340.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Nevada Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

## Count XIII
### Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, et seq.)
### On Behalf of Plaintiffs and the Minnesota Fee Class

341.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

342.    The Minnesota Prevention of Consumer Fraud Act (Minn. Stat. § 325F.68, et seq.) prohibits any unlawful, unfair, or fraudulent business act or practice.

343.    Defendants have engaged in business practices that are:

a. Unlawful because they violate Minn. Stat. § 325F.68, et seq. and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

344.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Minnesota Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

### Count XIV
### The Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101, et seq
### On Behalf of Plaintiffs and the Tennessee Fee Class

345.    Plaintiffs, on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

346.    The Tennessee Consumer Protection Act (Tenn. Code Ann. § 47-18-101, et seq prohibits any unlawful, unfair, or fraudulent business act or practice.

87

347.    Defendants have engaged in business practices that are:

a. Unlawful because they violate Tenn. Code Ann. § 47-18-101, et seq and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

348.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Tennessee Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

## COUNT XV
### Arizona Consumer Fraud Act (A.R.S. § 44-1521, et seq.)
### On Behalf of Plaintiffs and the Arizona Fee Class

349.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

350.    The Arizona Consumer Fraud Act (A.R.S. § 44-1521, et seq.) prohibits any unlawful, unfair, or fraudulent business act or practice.

351.    Defendants have engaged in business practices that are:

a. Unlawful because they violate (A.R.S. § 44-1521, et seq.) and the FTC Act by

88

falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

352.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Arizona Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

(A.R.S. § 44-1521, et seq.)

## Count XVI
## Washington Consumer Protection Act (Wash. Rev. Code § 19.86.010, et seq.)
### On Behalf of Plaintiffs and the Washington Fee Class

353.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

354.    The Washington Consumer Protection Act, Wash. Rev. Code § 19.86.010, et seq., prohibits any unlawful, unfair, or fraudulent business act or practice.

355.    Defendants have engaged in business practices that are:

a. Unlawful because they violate (Wash. Rev. Code § 19.86.010,) and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

356.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Washington Fee Class have suffered economic harm and are entitled to restitution and injunctive relief.

**Count XVII**
**Maryland Consumer Fraud Act**
**On Behalf of Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Fee Classes**

357.    Plaintiffs on behalf of themselves, and all others similarly situated, repeats and re-alleges paragraphs 1 through 204, as if fully set forth herein.

358.    The Maryland Consumer Fraud Act prohibits any unlawful, unfair, or fraudulent business act or practice.

359.    Defendants have engaged in business practices that are:

a. Unlawful because they violate the Maryland Consumer Fraud Act and the FTC Act by falsely advertising the price of rent;

b. Unfair because the conduct is unethical, oppressive, or substantially injurious

to consumers because the advertised price of rent is not the actual amount of rent paid after a non refundable fee is paid;

c. Fraudulent because Defendants made specific misleading statements, omissions, or deceptive conduct regarding the price of rent that deceived or had the tendency to deceive the public.

360.    Defendants' offices that created, implemented, and benefited from the policies in regards to the advertisement of the deceptive rent prices and drip pricing of mandatory fees originated from Defendants offices in Texas that impacted Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Fee Classes.

361.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the California, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington Fee Classes have suffered economic harm and are entitled to restitution and injunctive relief.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays that the Court enter an Order:

a.    Certifying this action as a class action as provided by Rule 23 (b)(2) and (b)(3), appointing Plaintiffs as Class Representatives of the Classes, and appointing the undersigned as Class Counsel;

b.    Adjudging that Defendants violated the FRLTA and the FCCPA and

awarding Plaintiff and Security Deposit and Full Deposit Return Class members actual damages in the security deposit amounts collected or withheld by Defendant and amounts paid after receiving a non-certified mail Notice Letter from Defendant;

    c.    Adjudging that Defendants violated the UDAP laws of California, Georgia, Maryland, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington;

    d.    Awarding damages under the UDAP laws of California, Maryland, Georgia, North Carolina, Illinois, Texas, Colorado, Florida, Nevada, Minnesota, Tennessee, Arizona, and Washington;

    e.    Awarding additional statutory damages to Plaintiff Glasbrenner and Security Deposit Class Members under the FCCPA;

    f.    Awarding Plaintiff her costs and attorneys' fees action pursuant to the FCCPA, and FRLTA and state UDAPs; and

    g.    Awarding such other and further relief as the Court may deem just and proper.

Dated: April 3, 2025        **CONSUMER LAW ADVOCATE, PLLC.**

                By:    /s/ Matthew T. Peterson
                        Matthew T. Peterson; FBN: 1020720
                        1000 Brickell Ave, Suite 715
                        Miami, FL 33131
                        Telephone: (786)-843-1933
                        mtp@lawsforconsumers.com